## TIEDJEN v. NATIONAL ELEVATOR CO.

(Supreme Court, Appellate Division, First Department. February 11, 1909.)

1. MASTER AND SERVANT (§ 278*)—ACTION FOR DEATH OF WORKMAN—LABOR LAW AS TO SCAFFOLDS—EVIDENCE OF NONCOMPLIANCE THEREWITH—SUFFICIENCY.

Evidence in an action for the death of a workman killed while at work in an elevator shaft *held* not to justify a finding that defendant failed to fully comply with section 18 of the Labor Law (Laws 1897, p. 467, c. 415), requiring suitable and proper scaffolds so constructed, placed, and operated as to give proper protection to the life and limb of the person using them.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

2. MASTER AND SERVANT (§ 265*)—ACCIDENT TO WORKMAN USING SCAFFOLD—HAPPENING AS EVIDENCE OF DEFECTS.

The mere happening of an accident to a workman using a scaffold, where the scaffold itself did not give way, is not evidence that it was caused by a defect therein, or in its supports and appliances.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 881; Dec. Dig. § 265.*]

Houghton and Clarke, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by Louise Tiedjen, as administratrix of Paul Tiedjen, deceased, against the National Elevator Company for the death of plaintiff's intestate. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, CLARKE, and HOUGHTON, JJ.

Frank V. Johnson, for appellant.
Thomas J. O'Neill, for respondent.

INGRAHAM, J. The defendant, a domestic corporation, is engaged in the manufacture of elevators, and on the 6th of September, 1906, was installing elevators in a building on the corner of Sixty-Second street and Broadway in the city of New York. The plaintiff's intestate was in the employ of the defendant. There were two elevator shafts in the building. In one of these shafts, which was about 11 by 21 feet, the deceased and a helper were engaged in placing brackets in one of the elevator shafts, to which were to be affixed rails to control the counterweight for the elevator. The men had commenced on the ground floor and had worked up to the fourth or fifth story. Some time previous there had been constructed in this elevator shaft by other workmen a scaffold which, so far as appears, was properly constructed and complied with the Labor Law (chapter 415, p. 461, of the Laws of 1897). This scaffold was suspended by a rope over a pulley upon the top of the elevator shaft and was moved from time to time by the deceased and his helper as the necessities of their work required. This scaffold was about 10 feet long and 2 feet wide. The defendant's foreman who had charge of this work was called as a witness for the plaintiff, and testified that he found this scaffold sus-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

pended in the shaft, and obtained permission to use it from the foreman of the building; that he inspected the scaffold and its appurtenances to see that it was properly constructed, placed, and secured before it was used; that then the deceased and his helper commenced to use the scaffold and had been using it about a week before the accident; that the day before the accident the scaffold was moved by the deceased and his helper to enable them to proceed with the work in the morning; that shortly after the men went to work on the 6th of September, for some unexplained reason, the two men fell off the scaffold and both were killed; that immediately after the accident the foreman inspected the scaffold, and found that it was swinging out from the wall of the shaft. On cross-examination the witness testified that the men were engaged in boring a hole in the inside of the shaft to insert bolts to hold the brackets; that there was a bracket at each floor and an intermediate bracket between the floors; that as they worked up the shaft they changed the position of the scaffold from time to time as the work required; that the persons who had used this scaffold before were the concreters lining the shaft with concrete; that the deceased asked permission to use this scaffold saying that he would rather use it than the other scaffolding provided by the defendant; that the men at work were in the habit of sitting on the scaffold and drilling holes in the concrete on which to insert the bolts. What was called a "furring strip" was nailed to the scaffold, and extended over to the opposite wall of the elevator shaft to steady the scaffold. After the accident the scaffold was found in perfect condition and just the same as it had been before, except that this furring strip was hanging loose; the only change being that this furring strip had fallen away from the side of the shaft and was hanging down. As the scaffold was moved from place to place the deceased and his helper were in the habit of securing it by this furring strip in a proper manner and that was part of their work. On redirect examination the witness testified that the security and safety of a scaffold depends upon how it is secured each time it is moved; that after the scaffold had been moved the witness looked in at the scaffold from the fourth floor and it was not shifted after he examined it. This furring strip was about 1 inch by 2 inches and 11 or 12 feet long. That this furring strip was not lumber belonging to the company but had been left there by other workmen; that the defendant had furnished plenty of materials to do this work; that for a week or so before the accident these furring strips were used for braces; that this scaffold had a rail around it 2 or 2½ feet high and also had side irons; that this furring strip was laid from the scaffold horizontally over to a concrete girder; that the company had two-inch plank to make these scaffolds and for doing this work, but the scaffold was used at the deceased's request.

The men went to work at 8 o'clock and the accident happened about five minutes after 8—just after the men went to work. No one saw them fall and there is no evidence that at the time the scaffold fell the men were actually at work drilling holes in the concrete. There is nothing to show that in getting on the scaffold or in some other

way the men had not dislodged this brace, or that the insufficiency of the brace had anything to do with the accident.

While fully recognizing the obligation of the defendant under section 18 of the Labor Law (chapter 415, p. 467, of the Laws of 1897) to provide suitable and proper scaffolds so constructed, placed, and operated as to give proper protection to the life and limb of a person using them, I do not think that the evidence justified a finding that this provision was not fully complied with. The mere happening of the accident where the scaffold itself did not give way is not evidence that the accident was caused by a defect in the scaffold itself, or in its supports and appliances, and there is nothing upon which a finding could be based that the scaffold was an improper one for the purpose for which it was furnished and used. If there had been evidence that the men were at work and the accident happened because this furring strip that was used to support it was insufficient for that purpose a different question would be presented; but upon this evidence I do not see how the jury were entitled to assume or that we on this appeal can assume that the brace was insufficient. In fact I can find no evidence that the men were on the scaffold at all at the time they fell or that they did not fall from the scaffold while getting on it. The cause of the accident being unproved, and there being no circumstances from which the legitimate inference can be drawn that the scaffold itself was unsafe or improperly constructed, or that the accident happened because of any condition of the scaffolding itself or from any fault of the defendant, I do not think that the verdict is sustained by the evidence.

For that reason, the judgment appealed from must be reversed, and a new trial ordered, with costs to the appellant to abide the event.

PATTERSON, P. J., and McLAUGHLIN, J., concur.

HOUGHTON, J. (dissenting). Plaintiff's intestate and his helper were in the employ of the defendant and were engaged in drilling holes in girders and the concrete and brick wall inside an elevator shaft necessary to the installing of an elevator. The elevator shaft was about 10 by 20 feet and ran up through the various stories of the building. The usual mode of providing a place for men to do this kind of work was to build a temporary flooring in the shaft at each story, and on this flooring place horses and scaffolding as the occasion required. This particular work was done, however, by suspending a swinging scaffold in the elevator well and raising it from time to time as the work progressed. This swinging scaffold which the defendant adopted and permitted the deceased and his helper to use was about 10 feet long and about 2 feet wide and had a rail around the outer side and ends. The work being done required pressure toward the wall from the inside of the scaffold, and hence it became a necessity to fasten it in some manner so that it would not swing out from the wall. The method adopted was to tie the scaffold to the wall at one end with a rope, and at the other, designated in the evidence as the "far" end, was attempted to be held in place by

a furring strip ⅞ to 1 inch thick and 1½ to 2 inches wide and about 10 feet long, fastened to the end of scaffold and placed against the opposite side of the elevator shaft in a slanting position.    Deceased and his helper began their operations at the bottom of the shaft, themselves lifting the scaffolding as their work required, tying the one end with a rope and adjusting the brace at the other.    They had been engaged in this work for about 10 days and had progressed to about the fourth floor when the accident occurred.    On the day of the accident the deceased and his helper left their fellow workmen to go upon the scaffolding to resume their work, and in a very few minutes thereafter both of them plunged to the bottom of the shaft, and both were killed.    The scaffold was seen to be swinging, one end tied, and the stick which had acted as a brace at the other end hanging down from the scaffold.    Blood was observed on a bracket immediately underneath the far end of the scaffold.    No one saw the accident, and how it actually happened is left to inference from the circumhtances disclosed.

The jury found a verdict in favor of plaintiff, and the defendant appeals and urges that no negligence on its part was shown, and no freedom from contributory negligence on the part of the deceased; and, further, that the deceased assumed whatever risk there was because he adjusted the scaffold himself from time to time, and, besides, had himself suggested the use of the swinging scaffold rather than the building of one as the work progressed from floor to floor.

The plaintiff insists that, inasmuch as her intestate was at work upon a scaffolding suspended upon an overhead support more than 20 feet from the ground, it was incumbent upon the defendant under section 18 of the Labor Law (Laws 1897, p. 467, c. 415) to see to it that such scaffolding was so fastened as to prevent it from swinging from the wall of the elevator shaft; and that this was a duty which was imperative upon the defendant, and which it could not delegate to its foreman or to the intestate himself, and, further, that from the circumstances of the accident it is fairly to be inferred that the deceased was not negligent, and that the assumption of risk was one particularly for the jury to pass upon.

It seems to me that plaintiff's position is correct and that the judgment in her favor should be affirmed.    Section 18 of the Labor Law prescribes that one employing another to perform labor of any kind in the erection, repairing, or altering of a house, building, or structure, shall not furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, or other mechanical contrivances which are unsafe, unsuitable, or improper, and which are not so constructed, placed, and operated as to give proper protection to the life and limb of a person so employed or engaged.    The particular language of this section applicable to the present case, bearing upon the question of scaffolding, is as follows:

"Scaffolding or staging swung or suspended from an overhead support, more than twenty feet from the ground or floor, shall have a safety rail of wood, properly bolted, secured and braced, rising at least thirty-four inches above the floor or main porticns of such scaffolding or staging and extending along the entire length. of the outside and the ends thereof, and properly attached

thereto. And such scaffolding or staging shall be so fastened as to prevent the same from swaying from the building or structure."

The latest expression of this court on the subject is found in the opinion of Mr. Justice Clarke in Warren v. Post & McCord, 128 App. Div. 572, 112 N. Y. Supp. 960. In that opinion he quotes with approval from the opinion in Madden v. Hughes, 104 App. Div. 101, 93 N. Y. Supp. 324, where it is said:

"The purpose of the statute was to impose an absolute duty on the master which could not be delegated."

In speaking of the same statute in Stewart v. Ferguson, 52 App. Div. 317, 65 N. Y. Supp. 149, affirmed 164 N. Y. 553, 58 N. E. 662, Mr. Justice Rumsey said:

"In respect to that matter, it has been held in the cases cited above that, while the statute does not make the master a guarantor of the safety of the scaffold, yet the construction of it is his personal duty, as distinguished from the duty of the servant; and that the master is bound to use reasonable care to see that the scaffold furnished is not unsafe, but is safe and proper for the use for which it is intended; and that he cannot delegate that duty to another, and relieve himself from responsibility merely by reason of the fact that he has selected a person of approved skill and fitness, and has furnished him with the material with which to do the work; but that although that has been done, yet if the scaffold is not suitable or safe or proper, the negligence, if any, in so building it is the negligence of the master."

In its opinion affirming this court, the Court of Appeals says:

"Section 18 is a positive prohibition laid upon the master without exception upon account of his ignorance or the carelessness of his servants."

It was manifestly a question for the jury to determine whether a necessarily frail strip 10 feet long, ⅞ of an inch thick and 1½ to 2 inches wide, necessarily placed in a slanting position, was a sufficient brace for the untied end of the scaffold. The swinging scaffold itself was properly constructed and had the outer rail. But the statute is as mandatory with respect to fastening to prevent swaying as it is in regard to the construction of the scaffolding itself. The language is "such scaffolding or staging shall be so fastened as to prevent the same from swaying from the building or structure." In doing the work which the deceased and his helper were required to do they must press against the wall in order to bore holes in the concrete and brick. Such work would necessarily throw the scaffold from the wall, and tying or bracing became an absolute necessity to protect them from falling forward from the scaffold. The circumstances surrounding the accident show that these two men met their death by pitching forward between the wall and the scaffolding as it swung out because of insecure bracing. It is quite improbable that two men would fall over the outer rail and on the brace and knock it out of place, as it is urged the accident might have occurred. One man might fall off in this way, but it is quite improbable that two would. The men were seen going towards the scaffold to their work. The brace was out of place and the scaffold swaying. Blood was discovered on a bracket underneath the loose end of the scaffold in line with a body falling from the inner side of the scaffold and the brace was hanging down. The fair inference is that as the men started their work the

scaffold swung out, and they fell forward between the scaffolding and the wall, one hitting the bracket and leaving a blood mark. If they had fallen in any other direction they could not have hit the bracket, and hence no blood could have been left on it by their fall.

Under the doctrine of Irish v. Union Bag & Paper Co., 103 App. Div. 45, 92 N. Y. Supp. 695, affirmed 183 N. Y. 508, 76 N. E. 1097, and McHugh v. Manhattan Railway Co., 179 N. Y. 379, 72 N. E. 312, it seems to me that we are not required to reverse the judgment on the ground of lack of proof as to care on the part of the deceased. Manifestly the deceased was at his place of work else the fall would not have set the scaffold swinging, as it was observed to be shortly after the accident. Besides, he was familiar with the work, and a perfectly apparent cause for the accident without negligence on his part is present in the insecure brace which the defendant permitted to be used.

A more serious question is whether or not the deceased assumed the risk. He had worked his way up from the bottom of the shaft, raising the scaffolding as occasion required, and fixing in place the same brace which gave way, as often as the scaffolding was moved. There is testimony in the case that the deceased himself suggested the use of the swinging scaffold and asserted that he preferred to use that to building a staging floor, and of course he knew of the frail brace that he was using, lashed to the far end of the scaffold. There is no testimony in the case, however, that he actually knew that it was an unsafe method or an insecure appliance. In Madden v. Hughes, 185 N. Y. 466, 78 N. E. 167, a judgment for plaintiff was sustained on the ground that it did not appear that plaintiff knew at the time he used the plank in constructing the scaffold from which he fell that they were unsafe or improper.

It is true that the evidence that the plaintiff's intestate desired to use the swinging scaffold and himself suggested its use is uncontradicted. Evidence of this character always is uncontradictable because the man who is alleged to have spoken is dead. Because it is uncontradicted, however, it need not be and should not be taken as an absolutely uncontradicted fact in a case of this character. Testimony that a dead man selected the appliance which caused his death is ordinarily given by the employer or some one in authority under him and is highly interested testimony. It should always be looked upon with suspicion, and is manifestly for the jury to believe or disbelieve. The jury in this case has seen fit to disbelieve it, and their conclusion in that respect should not be disturbed.

While the evidence is meager and would be much more satisfactory if clearer in some respects, it seems to me, in view of the positive duty of the master imposed by the section of the labor law referred to, that the judgment which the jury has seen fit to give the plaintiff should be affirmed.

CLARKE, J., concurs.